**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:14-CV-00143-TBR**

REESE BAILEY, III,                                                                                      Plaintiff,

v.

KENTUCKY COMMUNITY AND
TECHNICAL COLLEGE SYSTEM,                                                       Defendant.

## MEMORANDUM OPINION

Between 2006 and 2012, Reese Bailey III alleges some of his coworkers and supervisors at the Hopkinsville Community College Campus of the Kentucky Community and Technical College System discriminated against him because of his race. He filed this lawsuit under Title VII of the Civil Rights Act of 1964, claiming (among other things) that KCTCS refused to promote him and created a hostile work environment. Yet Bailey's complaint comes at too late a date. The timely filing of a charge of discrimination is a condition precedent to maintaining a Title VII lawsuit—and it is condition that Bailey has not satisfied. Accordingly, KCTCS's Motion for Summary Judgment (R. 30) is **GRANTED**.

### I.

### A.

### 1.

Since 1999, Reese Bailey III has been a full-time employee of the Kentucky Community and Technical College System, Hopkinsville Community College Campus. *See* R. 35-1 at 8–11 (Bailey's Deposition); *see also* R. 30-4 at 7–10 (Application for Full-Time Employment). Bailey held the title of Workforce Development Liaison in the

Technical Education and Workforce Development Department.  *See* R. 35-1 at 8–11. From 1999 to 2006, Bailey's supervisor was Dr. David Burgos, the Dean of the Department.  *Id.* at 16–17.

## 2.

Around 2006, as part of a major restructuring, the Continuing Education Department and the Technical Education and Workforce Development Department were consolidated into the Community, Workforce, and Economic Development Department. *See id.* at 8–18.  Many personnel changes happened between 2006 and 2007:  Dr. Burgos vacated his position, and Randal H. Wilson became Chief of the Department and Bailey's supervisor, *see id.* at 17–18; Bailey was promoted to Director of the Department, *see id.* at 19–20; and Carol Kirves became the Associate Dean of the Continuing Education Department, a position comparable to Bailey's, *see id.* at 19–20.

Prior to the merger, the Technical Education and Workforce Development Department's support staff consisted of a receptionist who assisted the whole Department, and two assistants who reported to Bailey.  *See id.* at 19–21.  Following the merger, Wilson reassigned the support staff to Kirves.  *See id.*  Bailey assumed responsibility for Tara Rascoe, the Coordinator for the Youth Workforce Connections Program, and two other individuals who worked in the agricultural field.  *See id.* at 21–22.  Bailey felt the work of the latter two individuals really had little to do with the work of the Department.  *See id.* at 27.

## 3.

In 2009, Bailey generated around $400,000 for his division in the Department.  *Id.* at 152.  The following year, he generated more than $700,000.  *Id.* at 148.  During a

meeting held sometime in 2010, the Department celebrated that fiscal success, and Wilson said: "Now we can make the changes we've been waiting to make." *Id.* at 149 (internal quotation marks omitted).  From Bailey's point-of-view, Wilson's statement "meant, now we can get rid of Reese Bailey." *Id.*  Bailey testified that the "only change I saw he was trying to make was to get rid of me." *Id.*  When asked why he thought that Wilson wanted to oust him, Bailey said:

> [H]e instructed the whole staff who . . . [Kirves] was supervising, not to work with me.  He complained about every decision I made.  And any time he could find any little fault, like saying I made a mistake, he would blow it—he'd just make a big deal out of it and it wasn't even my fault. He was just making up stuff.

*Id.* at 150.

## 4.

On April 21, 2010, Wilson, Bailey, and two of Bailey's coworkers, Tammie Van Buren and Kirves, were returning to Hopkinsville from a work-related meeting in Lexington, Kentucky.  *See id.* at 26, 28–29; *see also* R. 30-7 at 1–2 (EEO Complaint of April 23, 2010).  During the return trip, Van Buren told a story about a conversation she had with a young African-American woman who asked about job opportunities in cosmetology.  *See* R. 35-1 at 28–30; R. 30-7 at 1–2.  Van Buren relayed "statements [made by the caller] with negative racial and sexual connotations," R. 30-7 at 1, which others in the car (excluding Bailey) found funny, *see* R. 35-1 at 29.  The conversation apparently insinuated that "little black girls" were "prostitutes because they didn't have jobs or something."  R. 35-1 at 29.  Near the end of the conversation, Wilson "stated in a humorous manner" that young African-American "girls don't have no jobs."  R. 30-7 at 2; *see also* R. 35-1 at 29.  Bailey said that he had daughters who didn't "fall into the category described in the story," mentioning one of his daughters by name.  R. 30-7 at 2;

*see also* R. 35-1 at 29.  Then, Wilson made another statement, "saying 'she don't have no job'" either.  R. 30-7 at 2; *see also* R. 35-1 at 29.

A few days later, Bailey sent Wilson an e-mail to share his thoughts about the April 21 incident.  *See* R. 30-7 at 1–2.  Subsequently, Wilson forwarded the e-mail from Bailey to Yvonne Glasman, the Human Resources Director at Hopkinsville Community College.  *See* R. 35-2 at 5, 16 (Glasman's Deposition).  An investigation ensued per the College's standard operating procedure.  *See id.* at 17–18 (describing the typical investigatory process).  According to Glasman, the matter was resolved informally:  Dr. James Selbe, President of the College, asked Wilson to speak to Bailey; Wilson apologized to Bailey; and Bailey accepted the apology.  *Id.* at 18–19.

**5.**

Soon after this incident, Bailey took issue with his 2009–2010 performance evaluation.[1]  During the relevant period, Wilson was Bailey's supervisor and evaluator, and Dr. Selbe was Wilson's supervisor and, consequently, Bailey's reviewer.  R. 30-2 at 1; *see also* R. 35-2 at 20–21.  Citing a lack of attention to detail—in particular, incorrect data entry and poor project management related to a recent audit—Wilson assigned Bailey a "Fully Met Job Requirements" rating.  R. 30-2 at 6.  Bailey disagreed with the substance of Wilson's evaluation and approached Glasman on May 18, 2010.  *See* R. 30-8 at 2 (E-Mail Correspondence with Glasman and Dr. Selbe); *see also* R. 35-2 at 19–20.

---

[1] In way of background, the performance evaluation process works something like this:  There is an evaluator (who is the employee's supervisor) and a reviewer (who is the evaluator's supervisor).  *See* R. 35-2 at 20; *see also* R. 35-1 at 42–43.  The evaluator is responsible for assigning the employee one of five overall performance ratings, with "Did Not Meet Job Requirements" as the lowest possible rating, "Consistently Exceeded Expectations" as the highest, and "Fully Met Job Requirements" resting squarely in the middle.  *See* R. 30-2 at 9 (Performance Planning and Evaluation Form 2009–2010); *see also* R. 35-1 at 42.  After the evaluator prepares the performance review, the evaluator turns it over to the reviewer for approval.  *See* R. 35-1 at 42–43.  Once completed, the employee may accept the evaluation *in toto*; disagree with the evaluation, but accept it under protest; or disagree with the evaluation, and then appeal it pursuant to established procedures.  *See* R. 30-2 at 9.

According to Bailey, Wilson assigned him a "Fully Met Job Requirements" rating in retaliation for his complaint about the incident which occurred a month earlier on the return trip from Lexington. *See* R. 35-2 at 19–20; *see also* R. 30-8 at 2–3. Glasman scheduled a meeting between Bailey, Beverly Atwood, and Dr. Selbe for the afternoon of May 19. R. 35-2 at 20.

Following the meeting with Atwood and Dr. Selbe, Bailey sent Glasman an e-mail in which he said:

> [W]e discussed and came to full resolution of the three matters you and I talked about yesterday. Please accept this email as confirmation that all matters have been fully resolved and I do not expect a reoccurrence in the future. You have been so very wonderful and I really do appreciate your professionalism and concern. Thanks again.

R. 30-8 at 2; *see also id.* at 1 ("I no longer wish to proceed with a hostile workplace investigation and I consider all other issues to have been resolved."). Subsequently, on May 21, Bailey signed the Performance Planning and Evaluation Form, noting that while he disagreed with his assigned rating, he would not exercise his right to appeal. *See* R. 30-2 at 9–10.

### 6.

### a.

Next, on or around February 4, 2011, Bailey, Jerry Gilliam, and Van Buren met in Gilliam's office. *See* R. 35-1 at 34; R. 30-9 at 4 (EEO Complaint of February 14, 2011). Apparently Van Buren started yelling at Bailey about a scheduling error involving an instructor that the two shared. *See* R. 35-1 at 34–35; *see also* R. 30-9 at 4. According to Bailey, Van Buren became so enraged that "she left the office and slammed the door" hard enough to cause "pictures on the wall" to shake. R. 35-1 at 35; *see also* R. 30-9 at 4.

Shortly after leaving Gilliam's office, Van Buren approached Glasman and filed a complaint against Bailey. *See* R. 35-2 at 24; *see also* R. 30-10 (Van Buren's EEO Complaint of February 4, 2011). Subsequently, on February 14, Bailey e-mailed a complaint to Glasman in which he explained not only that incident, but also other issues regarding the circumstances of his employment. *See generally* R. 30-9 at 1–5. Glasman investigated this incident too, *see* R. 35-2 at 24, and, as a result, Dr. Selbe issued separate formal reprimands to Van Buren and Bailey for unprofessional behavior, *see id.* at 25; *see also* R. 30-11 at 1–2 (Van Buren's Letter of Reprimand); R. 30-12 at 1 (Bailey's Letter of Reprimand).

**b.**

On February 17, Dr. Selbe called Bailey and asked to speak with him in person. *See* R. 35-1 at 36, 156. Dr. Selbe told Bailey that both he and Van Buren "were at fault," that "something had to happen," and that he needed to transfer one of the two out of the Department. *Id.* at 36; *see also id.* at 157. To that end, Dr. Selbe proposed creating a position for Bailey in the library. *Id.* at 36, 156. Bailey maintained that he hadn't done anything wrong, that he wanted to stay in his current position, and then suggested moving Van Buren to the library instead. *See id.* at 36–37, 156–57. But Dr. Selbe responded: "That's not going to happen." *Id.* at 37 (internal quotation marks omitted); *see also id.* at 157. He offered Bailey an ultimatum: Either Bailey could take the position in the library, or he would be terminated. *Id.* at 37, 157. Dr. Selbe allowed Bailey time to sleep on the offer. *See id.* at 37.

Later that afternoon, Bailey e-mailed Dr. Selbe and accepted his offer. R. 30-18 at 1 (E-Mail Correspondence with Dr. Selbe); *see also* R. 35-1 at 157. He wrote:

> I would like to take this opportunity to again thank you for inviting me to meet with you earlier today.  The purpose of this email is to inform you that I accept your offer to appoint me to the new position in [Hopkinsville Community College's] library.  The fact that my salary and employment status will not change and that the college will pay for graduate classes in the library services field provides me an opportunity to make a seamless transition.  I had a good conversation with Cynthia Atkins and we agreed that the position you described will be a great fit for me.

R. 30-18 at 1.  During his deposition, Bailey explained why he sent the e-mail:  "I thanked him for allowing me to go to the library.  And the reason is I could have been unemployed if I didn't go where he wanted me to.  It doesn't change the fact that . . . it wasn't my choice."  R. 35-1 at 161; *see also id.* at 164–65.

Dr. Selbe responded with an informal e-mail, *see* R. 30-18 at 1, and then with a formal letter on February 25, *see* R. 30-13 at 1–2 (Dr. Selbe's Letter of February 25, 2011 to Bailey).  In his letter, Dr. Selbe included the following passage:

> This personnel action offered and accepted <u>should not be construed as a form of punishment by any means as a result of your retaliation claim</u>.  As you recall in our meeting, I assured you this is not a punishment.  As we discussed in our meeting and furthermore, by your acceptance of a voluntary transfer to another unit, I strongly believe that this will be in the best interest for you, the college and the students we serve.

R. 30-13 at 1–2.  When asked during his deposition if he agreed with the above passage, Bailey responded:  "I absolutely do not."  R. 35-1 at 160.  Yet Bailey's transfer became effective on March 16, 2011, and he assumed the title of Library Academic Director, *see* R. 30-14 at 1 (Dr. Selbe's Letter of March 25, 2011 to Bailey), under the supervision of Operations Librarian Cynthia Atkins, *see* R. 35-1 at 38–41.

**7.**

**a.**

During the course of Bailey's employment, three different presidents appointed three different individuals (on multiple occasions) to serve as the Chief of the

Community, Workforce, and Economic Development Department.  The sequence began in 2006.  Sometime that year, Dr. Selbe named Wilson as Chief after Dr. Burgos' departure.  *See* R. 35-1 at 17–18.  Wilson occupied that role until he was promoted in April 2010.  *See id.* at 30–31, 86.  Subsequently, Dr. Selbe appointed Gilliam to serve as the interim Chief.  *See id.*  Gilliam's appointment to Chief became permanent on March 7, 2012, as part of a comprehensive restructuring of the Academic Affairs Division.  R. 30-15 at 3 (Dr. Selbe's E-Mail of March 7, 2012 to College Staff and Faculty); *see also* R. 35-1 at 90.  Then, when Gilliam resigned in May 2013, Dr. Patrick Lake, the interim President, appointed Kirves and Wilson as co-interim Chiefs.  R. 35-3 at 5–6 (Kirves' Deposition).  Following Wilson's resignation in July 2013, Kirves became the sole interim Chief.  *Id.* at 5.  Dr. Jay Allen became the new President of the College in January 2014.  *See* R. 35-2 at 19, 40.  In July 2014, he made Kirves' appointment permanent, *see* R. 35-1 at 136, again as part of a major restructuring, *see* R. 35-2 at 38; R. 35-3 at 5, 7.

**b.**

There is no written policy governing the appointment of employees to vacant staff positions.  *See* R. 35-2 at 42–43.  Instead, the President of the College has the authority to appoint or reassign employees to various staff positions, including the position of Chief of the Department, or to advertise the vacancy to potential applicants.  *Id.* at 34–35, 42.  Neither Dr. Selbe nor Dr. Lake or Dr. Allen solicited applications for the position of Chief between 2006 and 2014.  *See* R. 35-1 at 112–13; R. 35-3 at 6–7.

**c.**

Bailey says that his desire to be considered for Chief of the Department was common knowledge.  Bailey testified that he told Wilson he "wanted to apply for the

8

position" in June 2006, R. 35-1 at 111, and that it was "not a stretch to think that [people knew] . . . I wanted to apply for [the position]. . . . I'm sure [Wilson] mentioned that to people," *id.* at 112.  When asked why he thought Dr. Selbe knew, Bailey responded: "[W]ho wouldn't want the job?  That's why I was there. . . . [W]hat about me would make him think that . . . I didn't want the job[?]"  *Id.* at 114.  Bailey's response when asked why either Dr. Lake or Dr. Allen "would have reason to believe [he] wanted" the position was similar:

> Well, I have reason to believe that when [Dr. Lake and Dr. Allen] came in they received information from people who were still there and people who were leaving.  So what they may believe about me is probably totally different from the actual facts of who I am and what I do.  And so they act on what they believe, what they're being told.  They don't know me.  I haven't spent any time with Dr. Lake or Dr. Allen except to shake their hand and say 'hi' and they act like they already know me.  So that tells me somebody's been talking to them.  And that's fine.  Whatever.

*Id.* at 167–68.

### d.

Bailey maintains he was more qualified than either Gilliam or Kirves.  Generally, to be considered for Chief of the Department, the applicant or appointee must hold a master's degree and two years of experience, or the equivalent.  *See* R. 35-2 at 43.  Bailey holds an associate's degree in political science from Phillips County Community College in Arkansas; a bachelor's degree in business from Columbia College in Missouri; and a master's degree in business management from Webster University in Missouri.  R. 35-1 at 105–06; *see also* R. 30-4 at 7.  Bailey also has maintained a "whole network of people . . . in all six counties" surrounding the College.  R. 35-1 at 105; *see also id.* at 141.  He has worked at Hopkinsville Community College as a full-time employee for sixteen years, give or take.  *See id.* at 141.

According to Bailey, he has the "same education, maybe even [a] better education, that's more pertinent to the field" than Gilliam, *id.* at 104–05, who holds a master's degree in agriculture, *id.* at 96, 113.   As for Kirves, Bailey thought he was "better qualified [than her] because" she holds a bachelor's degree.  *Id.* at 141.   True enough, Kirves holds a bachelor's degree in photo journalism from Western Kentucky University.   *Id.*   She has thirty-one years of experience at Hopkinsville Community College.  R. 35-3 at 18.   She held the title of Associate Dean of Continuing Education prior to becoming Chief of the Department.   *Id.* at 5.   Kirves also served on several system-wide committees, including those charged with reviewing Community, Workforce, and Economic Development Department guidelines.  *Id.* at 18–19.

## B.

## 1.

On March 27, 2013, Bailey filed a notice of a charge of discrimination against Hopkinsville Community College under Title VII of the Civil Rights Act of 1964 for race and sex discrimination.   R. 30-16 at 1 (EEOC No. 494-2013-00937 Charging Documents).   The notice related to promotion and sexual harassment, which allegedly happened from May 24, 2012 to March 20, 2013, and continued thereafter.   *Id.*   A completed charge of discrimination, signed and dated June 2, 2013, issued against the College on June 25, 2013.   *Id.* at 4–5.   Unlike the notice, the charge included allegations of retaliation in addition to race and sex discrimination.   *Compare id.* at 1, *with id.* at 5. The charge reads in full:

> I am a Black male who was hired by Hopkinsville Community College on March 1, 1999, as a Business and Industry Liaison.   The position I previously held was Director of Workforce Solutions.   My immediate supervisors were Randy Wilson and Jerry Gilliam.

I filed several EEO complaints between 2010-2013. All complaints were ignored by my employer. The company has a history of sexual harassment, gender discrimination, and racially discriminatory employment practices. In December 2012, I was over looked for a merit bonus and over looked for promotion and/or appointment. I was denied the opportunity to apply for a job vacancy. In February 2013 James Selbe refused to open a job vacancy. He didn't allow me to apply for the job and a less qualified co-worker was appointed.

I believe I have been discriminated against due to my race, Black, my gender, male and retaliated against, all of which violate Title VII of the Civil Rights Act of 1964, as amended.

*Id.* at 5.

A second related charge of discrimination, also signed and dated June 2, 2013, issued against the Kentucky Community and Technical College System on June 25, 2013. R. 30-17 at 1 (EEOC No. 494-2013-01125 Charging Documents). Charge No. 494-2013-01125 mirrors Charge No. 494-2013-00937, except that it included allegations related to disability discrimination too, and identified June 22, 2012 to April 18, 2013, and thereafter, as the relevant time period. *Id.* at 2. Bailey testified that he filed two charges because he was unsure if he needed to file against the College, the System, or both. *See* R. 35-1 at 193–95; *see also id.* at 199. The EEOC issued right to sue letters on April 18, 2014. R. 30-16 at 6; R. 30-17 at 3.

**2.**

Bailey instituted this action on July 19, 2014. R. 1 (Complaint). Since filing this lawsuit, Bailey has abandoned most of the claims he pleaded.[2] Only race discrimination

---

[2] Originally, Bailey alleged gender and disability discrimination, *see* R. 1 at 5, ¶¶ 22, 24–25, but has since abandoned those claims, R. 35 at 1 (Response to Motion for Summary Judgment). Bailey also alleged three additional discrete acts of race discrimination, namely, changes to his employment status; a negative performance review; and a denied merit bonus. *See* R. 1 at 6, ¶ 26; *see also* R. 35 at 16. But Bailey has conceded those to be untimely. *See* R. 35 at 16 nn.6–7; R. 53 at 5 n.3 (Response to Motion in Limine).

claims—of both the discrete act and hostile work environment variety—remain before the Court.[3]   *See id.* at 5–6, ¶¶ 23–24, 26.

## II.

## A.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

---

[3] While Bailey says that he also pleaded a retaliation claim under Title VII, *see* R. 35 at 1 n.1 (citing R. 1 at 3–5, ¶¶ 9, 10, 12, 26; R. 30-16 at 4; R. 30-17 at 1), the Court disagrees.  The closest Bailey comes to articulating a retaliation claim is when he says: "Between and including the years 2010 through 2013, Plaintiff filed several EEO complaints alleging race and gender discrimination, and then retaliation for filing said complaints."  R. 1 at 3, ¶ 9.  That bare, factual statement is not sufficient to plead a retaliation claim.

But even assuming, *arguendo*, that Bailey has stated a colorable retaliation claim, KCTCS would be entitled to summary judgment on that theory of liability too.  Any well-pleaded retaliation count would rest on the discrete acts identified in Bailey's complaint.  But all of those acts occurred earlier than May 31, 2012.  Therefore, Bailey's retaliation claim would be time-barred, just like his other Title VII claims.  *See infra* Part III.B.

12

As the party moving for summary judgment, KCTCS must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Bailey's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming KCTCS satisfies its burden of production, Bailey "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## B.

An evaluation of the scope of a party's claim at the summary judgment stage "amounts to a decision of the sufficiency of a pleading, which is a question of law" for the Court to decide. *Carter v. Ford Motor Co.*, 561 F.3d 562, 565 (6th Cir. 2009) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005)). The Federal Rules of Civil Procedure provide "for liberal notice pleading at the outset of the litigation because '[t]he provisions for discovery are so flexible' that by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the court.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (alterations in original) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002)). But the "nature of the notice requirement is much more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012) (citing *Tucker*, 407 F.3d at 787–88). With limited exception, then, a party may not raise new claims in response to a motion

for summary judgment.  *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006); *Tucker*, 407 F.3d at 788; *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 589–90 (6th Cir. 2002)).  The key issue in a challenge to the sufficiency of a pleading is notice. *Carter*, 561 F.3d at 565–66; *see also Kurtz v. McHugh*, 423 F. App'x 572, 579 (6th Cir. 2011).

## III.

Each claim remaining in this litigation involves Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 702(a)(1), 78 Stat. 253, 255 (codified at 42 U.S.C. § 2000e-2(a)(1)), which prohibits discrimination in employment on the basis of race, color, religion, sex, and national origin.  Under Title VII, "two types of actions may be brought: (1) 'discrete discriminatory acts,' and (2) claims alleging a 'hostile work environment.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)).  Discrete discriminatory acts include things such as "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114.  In contrast, hostile work environment claims involve "repeated conduct" permeating the workplace "with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 115–16 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Bailey alleges race discrimination claims of both the discrete act and hostile work environment variety.

### A.

Before going any further, the Court must resolve a threshold issue regarding the scope of Bailey's failure-to-promote claim.  On that point, the complaint says:

> In February 2013, Plaintiff was denied the opportunity to apply for an open job vacancy.  Dr. Selbe forbade Plaintiff from applying for it, and instead appointed a lesser-qualified, white, non-disabled co-worker to the position.  Plaintiff was as qualified if not more qualified than the white, non-disabled co-worker who was appointed.

R. 1 at 5, ¶ 21.  During discovery, KCTCS and Bailey agreed that the position referenced is that of Chief of the Community, Workforce, and Economic Development Department.  R. 30-1 at 17 (Memorandum in Support); *accord* R. 35 at 17.  While that concession resolved one ambiguity, it added a new wrinkle:  The position was never vacant in February 2013.  R. 30-1 at 17; *accord* R. 35 at 17.

KCTCS and Bailey disagree as to which vacancies Bailey's failure-to-promote claim encompasses.  KCTCS says that the failure-to-promote claim relates only to Dr. Selbe's decision to appoint Gilliam in March 2012.  *See* R. 37 at 2–5 (Reply Brief).  Bailey takes a different tack, recasting his complaint as alleging a "discrete discriminatory action . . . each time he was denied" the opportunity to apply for Chief of the Department.  R. 35 at 17–18.  Bailey argues, then, that his failure-to-promote claim not only included Dr. Selbe's appointment of Gilliam in March 2012, but also Dr. Lake's interim appointment of Kirves in May 2013 and Dr. Allen's permanent appointment of Kirves in July 2014 too.  *See id.* at 17.  The Court agrees with KCTCS.

Bailey's complaint is not a model of clarity or specificity.  It neither identifies the position from which Dr. Selbe excluded Bailey, nor does it name the person whom Dr. Selbe appointed to fill the vacancy.  *See* R. 1 at 5, ¶ 21.  Quite understandably, KCTCS asked Bailey to clarify some of those details during his deposition:

[Q.]    In Paragraph 21 of your complaint you talk about a job opening in February of 2013.  Do you see that?

A.    Uh-huh.  Yes.

Q.    Yes.  All right.  So tell me what job opening that was.

A.    I don't have the paperwork in front of me but I'm assuming that job opening pertains to an email that—that was sent out saying that Jerry Gilliam was appointed the Workforce Solutions chief, which I had been wanting to apply for for years.

. . . .

Q.    So is [Gilliam] who you're intending to refer to in Paragraph 21?

A.    I was intending to refer to the person in that email that you showed me.  Jerry Gilliam.

Q.    Jerry Gilliam?

A.    Different date.

Q.    Even though the [e-mail is dated] March 2012, this 2013 reference [in paragraph 21] you believe that you're talking about Jerry Gilliam?

A.    I'm not—I'm—I'm not sure.  I don't—I don't think that—I don't think that—I think this must be it, then.  Yeah.  Because that's what the announcement is. . . . Yeah.  That's the only thing that I think it might be.  Yeah.

Q.    Okay.  So this allegation we think is—the date's wrong.  We think we're referring to March 2012, Jerry Gilliam's appointment that you're referencing in this email; correct?

A.    Yes.

R. 35-1 at 85–86, 93–94; *see also* R. 30-15 at 3.[4]  When discovery closed, KCTCS

moved for summary judgment, addressing Bailey's failure-to-promote claim only as to

---

[4] While Bailey later made a comment about "any time someone was appointed for a position that I was intending to apply for, that was three times with Randy, Jerry and Carol," R. 35-1 at 190, he made the comment while elaborating on a request for the production of documents, *see id.* at 189–90.  Contrary to Bailey's suggestion, his statement hardly made the scope of his failure-to-promote claim "clear."  *See* R. 35 at 17.

Dr. Selbe's appointment of Gilliam. *See* R. 30-1 at 16–17, 28–29. In light of Bailey's deposition testimony, that makes sense. The fact that the complaint makes no mention of Kirves, Dr. Lake, or Dr. Allen—and only references Wilson in a manner unrelated to the failure-to-promote claim—further supports that conclusion. *See* R. 1 at 3, ¶¶ 10–11.

Even absent Bailey's deposition testimony, it is still not possible to read the complaint as broadly as his summary judgment response suggests. Comparing the two illustrates that point. While the complaint mentions a single (albeit incorrect) date, the response refers to at least three different dates spanning several years. *Compare id.* at 5, ¶ 21, *with* R. 35 at 17. The complaint references a single coworker being appointed to the position, but the response indicates multiple, different coworkers. *Compare* R. 1 at 5, ¶ 21, *with* R. 35 at 17. The complaint faults Dr. Selbe for denying Bailey an opportunity for promotion, yet the response attributes that wrongdoing not only Dr. Selbe, but also his successors, Dr. Lake and Dr. Allen. *Compare* R. 1 at 5, ¶ 21, *with* R. 35 at 17.

Consequently, it is difficult (and far from intuitive) to say the complaint provided KCTCS with sufficient notice that Bailey's failure-to-promote claim comprehended numerous appointments by and of different individuals over a three-year period. The complaint "contains little in the way of 'supporting facts'" that might provide some warning to KCTCS. *Carter*, 561 F.3d at 566. Despite ample opportunity, Bailey never moved to correct obvious deficiencies in his pleading—even following a lengthy discussion on the subject at his deposition. "Instead, [he] waited until after the deadline for discovery had passed to give any indication that [his] deposition testimony [might] not accurately characterize the scope of [his] claims." *Id.* at 568. With this litigation now in the eleventh hour, Bailey cannot expand his failure-to-promote claim to include

the subsequent appointments of Wilson and Kirves.  *Cf. Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015) (holding complaint failed to provide defendant "with sufficient notice" regarding particular absences on which plaintiff based her FMLA retaliation claim); *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013).

## B.

With the scope of his failure-to-promote claim resolved, the remaining question is whether Bailey timely filed a charge of discrimination concerning his race discrimination claims.  KCTCS argues that Bailey didn't because he alleged no discriminatory incident or act contributing to a hostile work environment during the limitations period.  *See* R. 30-1 at 10–19.  On that point, KCTCS is correct.[5]

## 1.

To file an action under Title VII, a complaining party must satisfy specific procedural prerequisites.  *See* 42 U.S.C. § 2000e-5; *see also Morgan*, 536 U.S. at 109. The timely filing of a charge of discrimination with the EEOC is one such condition precedent to maintaining a Title VII lawsuit.  *See Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999).  In a deferral state, such as Kentucky, *see Maurya v. Peabody*

---

[5] Bailey discusses the continuing-violations doctrine at some length.  *See* R. 35 at 14–20. Generally speaking, when a "continuing violation is found, 'a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'"  *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (quoting *Alexander*, 177 F.3d at 408).  In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court significantly narrowed the scope of the doctrine as it relates to discrete discriminatory acts.  *See generally Sharpe*, 319 F.3d at 266–69.

But, at least in this case, it is unnecessary to discuss those developments.  As Bailey candidly admits, the doctrine is applicable only if "the last related act occurred within the statutory period."  R. 35 at 14 (quoting *Brown v. Packaging Corp. of Am.*, 846 F. Supp. 592, 597 (M.D. Tenn. 1993)) (internal quotation marks omitted).  Bailey has identified no incident of discrimination or act contributing to a hostile work environment during that 300-day limitations period.  Therefore, the continuing-violations doctrine is of no consequence here.

*Coal Co.*, 823 F.2d 933, 934 (6th Cir. 1987), a charge of discrimination must be filed with a state or local agency no more than 300 days "after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1). "A claim is time barred if it is not filed within these limits." *Morgan*, 536 U.S. at 109.

Determining when an unlawful employment practice occurred varies based on the nature of the discrimination charged. "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110. Therefore, for discrete retaliatory or discriminatory acts, the 300-day clock "begins to run on the date the alleged discrimination occurred." *Neal v. Shelby Cty. Gov't Cmty. Servs. Agency*, 815 F. Supp. 2d 999, 1004 (W.D. Tenn. 2011) (citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 259–62 (1980)). The clock for a hostile work environment claim works differently. In contrast to discrete acts, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). For that reason, a charge alleging a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

**2.**

There is no genuine dispute that each alleged incident of discrimination or act contributing to a hostile work environment occurred before May 31, 2012 (*i.e.*, 300 days before Bailey filed his EEOC charges). While Bailey's complaint discusses incidents dating back to 2006, the most recent and well-pleaded discriminatory act relates to Gilliam's appointment on March 7, 2012. Consequently, Bailey's discrimination and

hostile work environment claims are time-barred under 42 U.S.C. § 2000e-5(e)(1). KCTCS is entitled to judgment as a matter of law.

## C.

Even if Bailey's failure-to-promote claim happened to include Kirves' interim appointment in May 2013 or her permanent appointment in July 2014, nothing changes. Bailey has not established a claim of racial discrimination regarding either instance. Accordingly, his discrimination and hostile work environment claims remain time-barred for the reasons just discussed.

## 1.

Bailey may establish a violation of Title VII by either direct or circumstantial evidence. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391–93 (6th Cir. 2008). Bailey concedes that he has presented no "direct evidence of racial discrimination." R. 35 at 20. Consequently, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973), applies.

Under this framework, Bailey must first establish a *prima facie* case of race discrimination. In the failure-to-promote context, that requires Bailey to show that:

> (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000) (citing *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1095 (6th Cir. 1996); *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir. 1982)). If, however, KCTCS "does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion," then Bailey "does not have to establish that he applied for and was

considered for the promotion." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000). Instead, KCTCS would be "held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known." *Id.*

If Bailey establishes a *prima facie* case, "[t]hen the burden of production shifts to [KCTCS] to proffer a legitimate non-discriminatory reason for the adverse action." *Riley v. PNC Bank, Nat'l Ass'n*, 602 F. App'x 316, 319 (6th Cir. 2015) (citing *McDonnell Douglas*, 411 U.S. at 802). If KCTCS is able to make that showing, "the burden shifts back to [Bailey] to show the proffered reason was pretext for discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804; *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Bailey may demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate [KCTCS's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews*, 231 F.3d at 1021 (citing *Mazer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). During each phase, the burden of persuasion rests on Bailey. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–56 (1981)).

## 2.

### a.

Even viewing the record in the light most favorable to Bailey, his failure-to-promote claim flounders on the "applied for" and "considered for" elements of his *prima facie* case. It is undisputed that when Dr. Lake and Dr. Allen made the challenged appointments, neither advertised the Chief of the Community, Workforce, and Economic Development Department vacancy; for that reason Bailey neither applied for, nor was he

considered for, it. *See* R. 35-1 at 112–13; R. 35-3 at 6–7. In consequence, KCTCS had a duty to consider those employees "who might *reasonably* be interested" in the position. *Dews*, 231 F.3d at 1022 (emphasis added).

Here, Bailey has raised no genuine issue of material fact as to why he fits into that category of employees, *i.e.*, those whom Dr. Lake or Dr. Allen should have reasonably considered interested in becoming Chief of the Department. To start, Bailey has not been involved in the Community, Workforce, and Economic Development Department since assuming his role as Library Academic Director on March 16, 2011, *see* R. 30-14 at 1, two years before Dr. Lake's, and three years before Dr. Allen's, arrival. So it isn't surprising that neither Dr. Lake nor Dr. Allen considered Bailey to be a person reasonably interested in the position. He had not occupied any position in that Department since March 2011 and, as far as the record reveals, the positions of Chief of the Department and Library Academic Director are markedly different. *See* R. 35-1 at 157–58. Therefore, Dr. Lake and Dr. Allen had no reason to consider Bailey when filling vacancies in the Department. *See Barron v. Fed. Reserve Bank of Atlanta*, 129 F. App'x 512, 517–18 (6th Cir. 2005) (finding employer had no duty to consider employee for promotion to a different department); *cf. Mercer v. Tractor Supply Co.*, No. 5:08-CV-00196-R, 2010 WL 489361, at *3 (W.D. Ky. Feb. 4, 2010) (holding employer had a duty to consider assistant store manager for a store manager opening because she "might reasonably have been interested" in the position).

However, Bailey disagrees with that assessment. *See* R. 35 at 22–23. Bailey suggests that "everyone knew he wanted to apply for that position," *id.* at 23, presumably including Dr. Lake and Dr. Allen. The record is not as generous as Bailey's depicts it.

For example, Bailey identifies only two persons to whom he actually expressed his interest to be considered for Chief of the Department: Wilson and Rascoe. *See id.* at 22–23. While Bailey spoke with Wilson about the subject, that conversation took place in June 2006—almost seven years before Dr. Lake appointed Wilson and Kirves on an interim basis. *See* R. 35-1 at 111–12. Likewise, Bailey's conversation with Rascoe is of no moment because she holds a non-management position. *See* R. 35-4 at 5–7, 35–36 (Rascoe's Deposition).

More to the point, the record is devoid of any evidence that Dr. Lake or Dr. Allen knew of Bailey's interest in the position. When asked why either "would have reason to believe [he] wanted" to be Chief of the Department, Bailey said:

> Well, I have reason to believe that when [Dr. Lake and Dr. Allen] came in they received information from people who were still there and people who were leaving. So what they may believe about me is probably totally different from the actual facts of who I am and what I do. And so they act on what they believe, what they're being told. *They don't know me. I haven't spent any time with Dr. Lake or Dr. Allen except to shake their hand and say 'hi'* and they act like they already know me. So that tells me somebody's been talking to them. And that's fine. Whatever.

R. 35-1 at 167–68 (emphasis added). Suffice it to say, Bailey's speculation about what (if anything) Dr. Lake and Dr. Allen knew about his interest in the position is insufficient to create a genuine dispute of material fact. *Cf. Hartsel v. Keys*, 87 F.3d 795, 802 (6th Cir. 1996) ("Although she concedes that Keys never said or did anything to indicate a tone of bias . . . she pointed to Keys's 'body language' and 'vibes.' Clearly, Hartsel has failed to proffer sufficient information to put these extremely subjective and vague allegations in logical context, and has therefore failed to exceed the scintilla threshold to prevent summary judgment."). Having failed to make his desire for promotion known, neither Dr. Lake nor Dr. Allen had reason to consider him for one. *Cf. Brennan v.*

*Tractor Supply Co.*, 237 F. App'x 9, 17 (6th Cir. 2007) (finding employer had duty to consider employee where district manager was "well aware" of the employee's "interest in a promotion").

In short, even if his failure-to-promote claim included instances subsequent to Gilliam's appointment, Bailey cannot show he "applied for" and was "considered for" the position.  Such a failure is fatal to his claim of race-based discrimination.

**b.**

Assuming Bailey could establish a *prima facie* failure-to-promote claim, KCTCS has provided a legitimate, nondiscriminatory reason for not offering Bailey the position. *See* R. 37 at 5–10.  First, KCTCS says that neither Dr. Lake nor Dr. Allen knew of Bailey's interest at the time that the decision to appoint Kirves was made.  *See id.* at 9. Second, KCTCS also suggests that Kirves is not only qualified to serve as Chief of the Department, but is more qualified than Bailey too.  *See id.* at 5 n.4.  Either rationale satisfies KCTCS's burden to articulate a legitimate, nondiscriminatory reason for not promoting Bailey.  *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (discussing deference owed to legitimately exercised business judgment); *Rapp v. Gen. Motors Corp.*, 59 F. App'x 724, 725 (6th Cir. 2003) (per curiam) (finding that employer articulated a legitimate, nondiscriminatory reason where no one involved in the hiring decision knew about the employee's interest in the position).

**c.**

Even viewing the record in the light most favorable to Bailey, he hasn't demonstrated KCTCS's proffered reasons are pretextual.  In addition to the absence of discriminatory animus on the part of either Dr. Lake or Dr. Allen, *see, e.g.*, R. 35-1 at

139, Bailey has come forward with no record evidence illustrating either gentleman knew about his interest in becoming Chief of the Department.  Moreover, it is undisputed that Kirves held the position of Associate Dean of Continuing Education (a subcomponent of the Community, Workforce, and Economic Development Department) immediately prior to her interim appointment in 2013.  R. 35-3 at 5.  Though Bailey might hold a higher degree in a more pertinent field, Kirves has thirty-one (compared to Bailey's sixteen) years of experience at Hopkinsville Community College.  *See id.* at 18; R. 35-1 at 141.  It is an unremarkable proposition that "for a supervisory position, an employer may hire an applicant with greater supervisory experience without facing a discrimination claim from a well-qualified plaintiff with much less supervisory experience."  *Johnson v. Box USA Grp.*, 208 F. Supp. 2d 737, 743 (W.D. Ky. 2002); *see also Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 516 (6th Cir. 2003) ("Anthony has failed to show that BTR's reasons are pretextual.  He does not present any evidence showing BTR's reasons were not based in fact or that they were not the real reasons for its decision.  Anthony only presents his own qualifications on the issue of pretext, and this is insufficient.").

There is also substantial, uncontroverted evidence that Dr. Allen's subsequent appointment of Kirves as Chief of the Department took place as part of a large-scale reorganization.  *See* R. 35-2 at 40–41.  By the time Dr. Allen appointed Kirves to the position, she had functioned in that capacity (on an interim basis) for over a year.  R. 35-3 at 5.  Bailey hasn't shown that Dr. Allen's choice to appoint Kirves lacked a basis in fact or failed to actually motivate his decision.  *See Hill v. Forum Health*, 167 F. App'x 448, 455 (6th Cir. 2006) (finding no triable issue as to allegation of pretext where employer

25

promoted an employee with prior, interim job experience, even if other employee might be slightly more qualified).

In consequence, even if Bailey's failure-to-promote claim happened to include Kirves' interim appointment in May 2013 or her permanent appointment in July 2014, KCTCS remains entitled to judgment as a matter of law.

## IV.

KCTCS' Motion for Summary Judgment (R. 30) is **GRANTED**.  An appropriate Order will issue separate from this Memorandum Opinion.

Date:

cc:      Counsel of Record

26